**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| TAI MATLIN and JAMES WARING., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:17-cv-07706 |
| | ) | |
| SPIN MASTER CORP.; SPIN MASTER LTD.; | ) | Hon. Virginia M. Kendall |
| SWIMWAYS CORPORATION; and KELSYUS, | ) | |
| LLC | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS'**
**MOTION FOR SANCTIONS PURSUANT TO FED. R. CIV. P. 11**

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ...................................................................................................1

II.    FACTUAL BACKGROUND ...............................................................................3

III.   ARGUMENT .......................................................................................................7

      A.     Legal Standard – Rule 11 Sanctions.......................................................7

      B.     Plaintiffs' Claims are Devoid of Any Basis in Fact or Law....................................9

            1.     A reasonable inquiry would have revealed that Defendants have no obligation to pay any compensation to Plaintiffs ......................................9

            2.     Plaintiffs' claims are also barred by the findings in the previous arbitrations in which they participated ......................................11

      C.     Plaintiffs' Claim of Fraud Is Not Warranted by Existing Law and Is Inadequately Pled ...............................................................................15

            1.     The Withdrawal Agreement precludes Plaintiffs' fraud claim ................16

            2.     Plaintiffs' fraud claim is also barred by the binding rulings in the Fourth Arbitration...............................................................................18

            3.     Plaintiffs' fraud claim is logically incoherent and inadequately pled .......19

IV.   CONCLUSION ..................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdul-Ahad v. Nationwide Mutual Fire Ins. Co.*,
No. CPU4-15-002616, 2016 WL 4269512 (Del. Ct. Common Pleas Aug. 10,
2016) ........................................................................................................................12

*In re Alberto*,
119 B.R. 985 (Bankr. N.D. Ill. 1990) .......................................................................8

*Berwick Grain Co. v. Illinois Dep't of Agriculture*,
217 F.3d 502 (7th Cir. 2000) .....................................................................................8

*Bethesda Lutheran Homes & Servs., Inc. v. Born*,
238 F.3d 853 (7th Cir. 2001) .....................................................................................8

*Bus. Guides, Inc. v. Chromatic Commc'ns Enter., Inc.*,
498 U.S. 533 (1991)....................................................................................................8

*Butler v. FDIC*,
No. 11-cv-6692, 2014 WL 843605 (N.D. Ill. Feb. 28, 2017)....................................9

*Cleary v. Philip Morris Inc.*,
656 F.3d 511 (7th Cir. 2011) .....................................................................................9

*Havoco of Am., Ltd. v. Freeman, Atkins, Coleman, Ltd.*,
58 F.3d 303 (7th Cir. 1995) ...............................................................................11, 12

*HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*,
545 N.E.2d 672 (Ill. 1989) ......................................................................................20

*Hybert v. Shearson Lehman/American Express Inc.*,
688 F. Supp. 320 (N.D. Ill. 1988) ...........................................................................12

*Matrix IV, Inc. v. Am. Nat'l Bank & Trust Co.*,
649 F.3d 539 (7th Cir. 2011) .....................................................................................9

*Midamines SPRL Ltd. v. KBC Bank N.V.*,
No. 16-cv-9429, 2018 WL 439211 (N.D. Ill. Jan. 16, 2018).....................................9

*Plastic Recovery Techs., Co. v. Samson*,
No. 11-c-2641, 2011 WL 3205349 (N.D. Ill. July 28, 2011) ..................................12

*Stulberg v. Intermedics Orthopedics, Inc.*,
997 F. Supp. 1060 (N.D. Ill. 1998) .........................................................................12

## TABLE OF AUTHORITIES
### (cont'd)

**Page(s)**

*Taylor v. Sturgell*,
    553 U.S. 880 (2008).................................................................................................11

*Thornton v. Wahl*,
    787 F.2d 1151 (7th Cir. 1986) ................................................................................8

**Other Authorities**

Fed. Rule Civ. P.
    9(b)............................................................................................................................19
    11.......................................................................................................1, 7, 8, 9, 20

Restatement (Second) of Judgments § 84 (1982) .........................................................12

## I.      INTRODUCTION

By this Motion,[1] defendants Spin Master Corp., Spin Master Ltd., and Swimways Corporation respectfully request that the Court issue appropriate Rule 11 sanctions, including the payment of attorneys' fees, against Plaintiffs Tai Matlin and James Waring and their attorneys, Stoltmann Law Offices, P.C., for making factual allegations in the Amended Complaint without having evidentiary support and failing to conduct a reasonable and competent inquiry before bringing this case.

Defendants bring this Motion reluctantly and only after exhaustive efforts to identify and warn Plaintiffs and their counsel of the fundamental and incurable defects in their claims against Defendants in the hopes of forestalling this baseless suit. Plaintiffs ignored these repeated warnings, however, thereby compelling Defendants to seek this relief from the Court for having to address Plaintiffs' frivolous claims that are not well-grounded in fact or law.

The present lawsuit is the latest in a long line of proceedings brought by plaintiffs Matlin and Waring seeking compensation they believe they are owed under a 1999 agreement (the "Withdrawal Agreement") entered into with a former employer, Gray Matter Holdings, LLC, which was later renamed 180s, LLC ("180s"). The agreement provides, *inter alia*, that certain identified products and the associated intellectual property rights were and remained the exclusive property of 180s and that Matlin and Waring were owed certain compensation resulting from licensing revenues and sales revenues *received by 180s* from the licensing or sale of these products. None of the named defendants is a party to this agreement.

In 2003, one of the named defendants, Swimways Corporation ("Swimways"), entered into an asset purchase agreement with 180s that included a purchase of the rights to the products and intellectual property that had been identified in the Withdrawal Agreement. The asset

_____

[1] Defendants serve and file this Motion while reserving all objections on the basis of jurisdiction or venue detailed in Defendants' Motion to Dismiss (Doc. 26), which was granted by this Court on July 20, 2018 (Doc. 40).

purchase agreement between 180s and Swimways unambiguously provides, however, that Swimways assumed no contractual obligations or liabilities of 180s outside of those contracts that were expressly identified in the agreement. The Withdrawal Agreement between 180s and Matlin and Waring was not one of the contracts assigned to Swimways through the asset purchase agreement between 180s and Swimways.

Over the course of four separate arbitrations, stretching back nearly 18 years, Plaintiffs litigated with 180s over the meaning of the Withdrawal Agreement, the effect of the asset purchase by Swimways on this agreement, and the compensation owed to Matlin and Waring under this agreement. In resolving these questions and claims, the various arbitrators issued a number of rulings that are relevant to the present suit. In particular, it has been determined in binding arbitration awards that: (i) 180s owned all rights in the intellectual property related to the products identified the Withdrawal Agreement and these rights were properly transferred to Swimways pursuant to the asset sale; (ii) the contractual obligations of the Withdrawal Agreement were not transferred to Swimways by 180s pursuant to the asset sale; (iii) 180s remains responsible for any compensation owed to Matlin and Waring under the Withdrawal Agreement; and (iv) Matlin and Waring were fully compensated under the Withdrawal Agreement for the transfer of relevant assets to Swimways.

Having effectively exhausted their ability to demand additional, unwarranted compensation from 180s, Plaintiffs have sued Defendants seeking yet more money under the Withdrawal Agreement, despite the fact that Defendants are not parties to and have not assumed the obligations of the Withdrawal Agreement. Plaintiffs' claims against Defendants are utterly frivolous given the unambiguous language in the Withdrawal Agreement and the asset purchase agreement, as well as the clear and binding rulings from the prior arbitrations.[2]

In sum, Plaintiffs and their counsel have been warned about the deficiencies in their

---

[2] Defendants also contend that all of Plaintiffs' claims are barred by the applicable statutes of limitations, but Defendants do not raise that additional defect as a basis for this Motion.

allegations, but failed to withdraw their Amended Complaint during the safe harbor period. On July 20, 2018, the Court granted Defendants' Motion to Dismiss (Doc. 26) for lack of personal jurisdiction and improper venue without prejudice. *See* Doc. 40. But, given Plaintiffs' persistence in pursing these frivolous claims, Rule 11 sanctions are necessary and appropriate to deter Plaintiffs from bringing these same baseless claims in a different forum. Indeed, on August 14, 2018, Plaintiffs filed an emergency motion for an extension of time, stating: "Plaintiffs have now retained the undersigned counsel from Chicago IP Law to assess the Court's decision [granting Defendants' Motion to Dismiss], their options for proceeding with this case, appealing the Court's decision or potentially refiling this case in another jurisdiction, in order to recover the damages that they believe they are factually and legally entitled to under the law." (Doc. 44 at 2.)

Plaintiffs' manufactured claims utterly lack evidentiary and legal support, however, and could not have been the product of a reasonable and competent inquiry. They and their counsel should be sanctioned by being held jointly and severally liable to pay Defendants' attorneys' fees and other costs and expenses incurred in dealing with this frivolous lawsuit, and their Amended Complaint should be dismissed with prejudice.

## II.    FACTUAL BACKGROUND

In 1997, Plaintiffs Tai Matlin and James Waring, along with Brian Le Gette and Ronald Wilson, formed Gray Matter Holdings, LLC ("Gray Matter"). *See* Ex. B, Second Arbitration Award and Opinion, at 1. After some disagreements and financial difficulties developed, Plaintiffs Matlin and Waring sold their shares in Gray Matter back to Le Gette, Wilson, and Gray Matter through a Withdrawal Agreement, executed June 1, 1999. *See id* at 2; Doc. 19-1 at 1-2.

Pursuant to the Withdrawal Agreement, in exchange for providing certain consulting services to Gray Matter, Plaintiffs were entitled to a percentage of sales and licensing revenues from Gray Matter for certain "Key Products," identified in Exhibit C in the agreement. *See* Doc. 19-1 at 3, 4-7, and Exhibit C. The agreement provided that the Key Products and associated intellectual property rights were and remained the exclusive property of Gray Matter and further included, to avoid any doubt, a separate provision assigning to Gray Matter any and all

inventions, discoveries, or improvements relating to any Key Products and associated intellectual property rights conceived or developed by Plaintiffs. *Id*. at §§ 2 & 3.4. In 2000, disputes arose between the parties as to the sufficiency of the services provided by Plaintiffs pursuant to the Withdrawal Agreement and as to the compensation Plaintiffs were owed under the agreement. Plaintiffs filed for arbitration for a first time (the "First Arbitration") in connection with this dispute. *See* Ex. A, First Arbitration Award; Ex. B. at 3.

Subsequently, in 2002, after Plaintiffs began demanding royalties related to certain products that were not identified as "Key Products" in the Withdrawal Agreement, Gray Matter initiated an arbitration proceeding (the "Second Arbitration") for a determination of the products for which Plaintiffs were owed sales and licensing compensation pursuant to the Withdrawal Agreement. *See* Ex. B. The arbitrator in the Second Arbitration found that Matlin and Waring, notwithstanding their assertions to the contrary, were not entitled to any compensation related to the licensing or sale of certain products. *Id*. at 7, 9-10.

In December 2003, Gray Matter, which had been renamed as 180s, LLC ("180s"), agreed to sell certain assets to Swimways Corp. pursuant to an asset purchase agreement. *See* Doc. 1-2 ("Kelsyus Purchase Agreement")[3]. Pursuant to the Kelsyus Purchase Agreement, the Buyer, Swimways, agreed to assume certain obligations of the Seller, 180s—namely, the "obligations of Seller[] under those agreements, contracts, and other similar arrangements set forth on Exhibit A to the Assignment and Assumption Agreement." *Id*. at § 1 (definition of "Assumed Liabilities"). Section 2(b) of the Kelsyus Purchase Agreement explicitly provides that Swimways **did not** assume any obligation or liability of 180s not expressly included within the definition of "Assumed Liabilities." This section states:

> (b) Assumption of Liabilities. On and subject to the terms and conditions of this Agreement and the Assignment and Assumption Agreement, Buyer agrees to

---

[3] The Kelsyus Purchase Agreement was attached as Exhibit 2 (Doc. 1-2) to the original Complaint but was not attached as an exhibit to the Amended Complaint, likely because it directly contradicts key allegations contained within the Amended Complaint.

assume and become responsible for all of the Assumed Liabilities at the Closing. Buyer will not assume or have any responsibility, however, with respect to any other obligation or liability of Sellers not expressly included within the definition of Assumed Liabilities.

*Id*. at § 2(b). Further, Exhibit A to the Assignment and Assumption Agreement ***does not*** identify the Withdrawal Agreement in its list of "Assumed Contracts." *Id*. at Exhibit A – Assignment and Assumption Agreement.

In 2007, Plaintiffs Matlin and Waring initiated another arbitration against 180s (the "Third Arbitration"), alleging breach of contract for failing to pay them proceeds from the sale of the Kelsyus product line to Swimways. In the Third Arbitration, Plaintiffs asserted, *inter alia*, that 180s breached Section 5.9 of the Withdrawal Agreement through the sale of the Kelsyus assets to Swimways (the "Asset Sale"). *See* Ex. C, Third Arbitration Ruling, at 8. The arbitrator noted that Plaintiffs advanced several theories with regard to this claim. Plaintiffs first argued that the Asset Sale constituted an assignment of 180s' rights and obligations under the Withdrawal Agreement to Swimways, purportedly in violation of Section 5.9 of the Withdrawal Agreement. Addressing this argument, the arbitrator held:

I hereby rule, as a matte[r] of law, that the Asset Sale to Swimways did not constitute an assignment of [180s'] rights and obligations as referred to in Section 5.9 of the of the Withdrawal Agreement. The Asset Sale was simply that, one for assets, and not for stock, and thus only the assets included in the transaction were conveyed to Swimways. The Withdrawal Agreement was not one of the assets transferred pursuant to the Asset Sale, and [180s] remains responsible for any compensation owed to Claimants under the Withdrawal Agreement.

*Id*. Further, addressing Plaintiffs' alternative argument that 180s breached Section 5.9 of the Withdrawal Agreement to the extent that it did not assign its obligations under the agreement to Swimways in conjunction with the Asset Sale, the arbitrator held:

I hereby find, as a matter of law, that the Asset Sale to Swimways did not constitute one of the triggering events for mandatory assignment as defined by Section 5.9 of the Withdrawal Agreement. While certain assets of [180s] were transferred in conjunction with the Asset Sale, the Withdrawal Agreement was not one of them, and Swimways is not a "successor" to [180s] as contemplated by Section 5.9 of the Withdrawal Agreement.

*Id*. at 8-9. Following this summary adjudication, a hearing was held in which the arbitrator

determined and awarded Plaintiffs the amount of compensation due to them arising out of the asset sale to Swimways. *See* Ex. D, Third Arbitration Award. The arbitrator found that "the Asset Sale was, in essence, a method of converting that stream of [royalty payments to 180s from Swimways pursuant to a number of settlement agreements] into a present, and discounted, lump sum payment." *Id*. at 4. Plaintiffs were awarded approximately $19,150 each pursuant to the formula provided by Section 3.5 of the Withdrawal Agreement for the sale of the Kelsyus assets to Swimways.

In 2014, Plaintiffs initiated yet another arbitration against 180s (the "Fourth Arbitration"), alleging five claims related to ownership of intellectual property rights in the Key Products and further compensation purportedly due to Plaintiffs under the Withdrawal Agreement. *See* Ex. E, Fourth Arbitration Ruling. Notably, in their statement of Count I, Plaintiffs expressly acknowledged that the arbitrator in the Third Arbitration ruled that the rights and obligations under the Withdrawal Agreement did not transfer to Swimways. *Id*. at 2. In rejecting Plaintiffs' argument in Count I that this previous ruling meant that the IP rights to the Key Products did not transfer to Swimways, the arbitrator found:

> The Withdrawal Agreement distinguishes between the transfer of assets (e.g., the Key Product assets and related intellectual property) with 'rights and obligations' of the Withdrawal Agreement. The Withdrawal Agreement and the prior arbitration rulings support the conclusions that (1) 180s owned all rights in the Key Product IP, (2) 180s had the right to transfer its assets (e.g., the Key Product assets and related intellectual property) to Swimways, (3) 180s transferred the Key Product assets and related intellectual property to Swimways, and (4) the Claimants [Matlin and Waring] were fully compensated for the transfer of the Key Products and related intellectual property to Swimways.

*Id*. The arbitrator found that Plaintiffs were bound by the prior arbitration ruling that 180s was the rightful owner of the intellectual property rights in the Key Products and that Plaintiffs could not now assert that 180s, "as the owner of the full right, title and interest in the patents", could not sell, license, practice, or even abandon this intellectual property. *Id*. at 3. Further, the arbitrator also rejected Plaintiffs' argument in Count II that 180s breached the Withdrawal Agreement by allowing Swimways to practice the invention embodied in the Key Product

intellectual property after the Asset sale transaction without payment to Plaintiffs, thereby denying Plaintiffs the royalty provided for in the Withdrawal Agreement. *Id*. at 5. Plaintiffs sought relief in the form of payment of the royalties purportedly due on the sales by Swimways, but this relief was denied, as Plaintiffs already "were [fully] compensated under Section 3.5" of the Withdrawal Agreement. *Id*. The arbitrator dismissed Plaintiffs' remaining three claims as well, including a claim that allegedly forged assignment documents in the chain of title for the Key Product patents put 180s' full and complete ownership of these patents into doubt. *See id*. at 5-6. The arbitrator subsequently denied Plaintiffs' motion to vacate the summary judgment award, and when Plaintiffs then attempted to initiate still another arbitration, the American Arbitration Association denied their request. *See* Exs. F, G, H.

Despite the clear language in the Kelsyus Purchase Agreement and these binding rulings from the previous arbitrations, Plaintiffs filed the present suit against Defendants, baselessly alleging that Defendants—Swimways and related entities—are somehow obliged to make royalty payments to Plaintiffs. *See* Doc. 1. Prior to filing this frivolous suit, counsel for Plaintiffs was informed of these prior arbitration rulings, was reminded of his ethical obligation not to pursue claims that are not well-grounded in fact or law, and was warned that in the event any civil litigation was filed in this matter, Defendants would seek all appropriate sanctions against Plaintiffs and their counsel. *See* Doc. 1-17. Plaintiffs subsequently obtained new counsel, who, despite warnings from Defendants' counsel that no amount of "clean up" or amendments to the original Complaint could save Plaintiffs' factually baseless and legally precluded claims, proceeded to file the present Amended Complaint. *See* Doc. 19. The Amended Complaint drops a duplicative breach of contract claim and shifts the focus of Plaintiffs' fraud and unjust enrichment claims, but it still fails to state a single non-frivolous claim for relief well-grounded in fact or law.

## III.    ARGUMENT

### A.    Legal Standard – Rule 11 Sanctions.

Rule 11(b) provides in relevant part that:

> By presenting to the court . . . a pleading, . . . an attorney . . . certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, . . . (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law; (3) the allegations and other factual contentions have evidentiary support, or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery . . . .

Fed. R. Civ. P. 11(b). As the Supreme Court has held, the "heart of Rule 11" is the message conveyed by the signer's certification that he "has conducted a reasonable inquiry into the facts and the law and is satisfied that the document is well grounded in both . . . ." *See Bus. Guides, Inc. v. Chromatic Commc'ns Enter., Inc.*, 498 U.S. 533, 542 (1991).

An "empty head but a pure heart is no defense" for a frivolous claim, as the test under Rule 11 is an objective one. *See Thornton v. Wahl*, 787 F.2d 1151, 1154 (7th Cir. 1986). Under the Rule, "a frivolous argument is simply one that is baseless or made without a reasonable and competent inquiry." *Berwick Grain Co. v. Illinois Dep't of Agriculture*, 217 F.3d 502, 504 (7th Cir. 2000). When determining whether a complaint is frivolous under Rule 11, a Court should consider "(1) whether the attorney or party made a reasonable investigation into the facts; and (2) whether the attorney or party made a reasonable investigation of the law." *In re Alberto*, 119 B.R. 985, 992 (Bankr. N.D. Ill. 1990) (citation omitted). A pleading "is not well-grounded in fact if it is contradicted by uncontroverted evidence that was or should have been known to the attorney or the party signing the filing." *Id.* (citation omitted). Moreover, asserting frivolous claims where "it should have been obvious to any lawyer that relief was barred on multiple grounds, including *res judicata*," has also been found to warrant sanctions under Rule 11. *See Bethesda Lutheran Homes & Servs., Inc. v. Born*, 238 F.3d 853, 859 (7th Cir. 2001).

The reasonable inquiry requirement applies not only to attorneys, but also to the parties they represent, as "the client is often better positioned to investigate the facts supporting a pleading or paper." *Bus. Guides, Inc.*, 498 U.S. at 534. Accordingly, parties who fail to conduct a reasonable inquiry can face sanctions under the Rule. *See* Fed. Rule Civ. P. 11(c).

Post-judgment motions for sanctions under Rule 11 are permissible, so long as the Rule 11 safe-harbor period has expired.[4] *See Matrix IV, Inc. v. Am. Nat'l Bank & Trust Co.*, 649 F.3d 539, 552 (7th Cir. 2011); *Butler v. FDIC*, No. 11-cv-6692, 2014 WL 843605 at *2, *5-6 (N.D. Ill. Feb. 28, 2017). Further, following a dismissal for lack of personal jurisdiction, a court maintains the authority to assess sanctions under Rule 11 for the filing of a frivolous complaint. *Midamines SPRL Ltd. v. KBC Bank N.V.*, No. 16-cv-9429, 2018 WL 439211, at *1, *8 n.4 (N.D. Ill. Jan. 16, 2018).

### B. Plaintiffs' Claims are Devoid of Any Basis in Fact or Law

#### 1. A reasonable inquiry would have revealed that Defendants have no obligation to pay any compensation to Plaintiffs

All three claims asserted by Plaintiffs in their Amended Complaint are based, directly (breach of contract) or indirectly (fraud and unjust enrichment), on an unfounded assertion that Defendants, collectively, are somehow obligated to pay royalties or other compensation to Plaintiffs because of Defendants' alleged sales of Key Products and licensing of Key Product IP. *See* Doc 19 at ¶85 (breach of contract), ¶77 (fraud), ¶89 (unjust enrichment).[5] According to Plaintiffs, Defendants' alleged payment obligations to Plaintiffs arose out the sale of certain assets by 180s to Swimways pursuant to the Kelsyus Purchase Agreement. This baseless theory is set forth in two paragraphs of the Amended Complaint, in which Plaintiffs allege:

---

[4] Defendants served counsel for Plaintiffs a substantially similar copy of the present brief for Rule 11 sanctions on March 21, 2018. *See* Ex. I (cover email attaching brief).

[5] Plaintiffs' unjust enrichment claim rests on the same conduct alleged in support of their fraud and breach of contract claims, either individually or in combination. *See* Doc. 19 at ¶90 (alleging "Defendants benefited from forged documents submitted to the USPTO and continued representations to the USPTO and Plaintiffs made through their counsel, Cooley, LLP, as alleged herein.") and ¶92 ("Plaintiffs did not benefit from Defendants' conduct," which is only true if Plaintiffs have been less than "fully compensated" pursuant to the Withdrawal Agreement for the sale of the Key Product IP in the Kelsyus asset sale.) Accordingly, Plaintiffs' unjust enrichment claim will stand or fall with their fraud and breach of contract claims. *See Cleary v. Philip Morris Inc.*, 656 F.3d 511, 517 (7th Cir. 2011) (In circumstances where "an unjust enrichment claim rests on the same improper conduct alleged in another claim, then the unjust enrichment claim will be tied to this related claim—and, of course, unjust enrichment will stand or fall with the related claim.").

26. Three years later, Swimways purchased, among other things, Key Product assets including Key Product IP (of which Matlin and Waring have a royalty interest in) from Gray Matter[/180s].

27. Swimways, through its purchase of Gray Matter's assets, assumed responsibility for payments of compensation to Matlin and Waring for sales of Key Products, based on Matlin and Waring's interest in the Key Product and Key Product IP and the associated rights pursuant to the Withdrawal Agreement, and thereby indemnified Gray Matter in the event of a dispute arising from a failure to pay Matlin and Waring under these provisions of the Withdrawal Agreement.

*Id*. at ¶¶33-34.

Because, as Plaintiffs acknowledge, *see id*. at ¶¶23-24, any royalty interest that Plaintiffs may have in the so-called Key Product IP stems from the Withdrawal Agreement, the question boils down to whether Plaintiffs and their counsel have a well-grounded basis in law and fact to allege that Swimways, through its purchase in 2003 of the Kelsyus assets from 180s, assumed responsibility for payments of compensation to Matlin and Waring under the Withdrawal Agreement for the sales of Key Products and/or the licensing of Key Product IP. A reasonable inquiry into the Kelsyus Purchase Agreement, which Plaintiffs attached to their original Complaint as Exhibit 2, would have revealed that Swimways did not assume these payment obligations pursuant to the Withdrawal Agreement between Plaintiffs and 180s.

In fact, the clear and unambiguous provisions of the Kelsyus Purchase Agreement regarding what contractual liabilities Swimways did and did not assume directly contradict Plaintiffs' allegation that Swimways assumed any obligations under the Withdrawal Agreement. Section 2(b) of the Kelsyus Purchase Agreement explicitly provides:

(b) Assumption of Liabilities. On and subject to the terms and conditions of this Agreement and the Assignment and Assumption Agreement, Buyer agrees to assume and become responsible for all of the Assumed Liabilities at the Closing. ***Buyer will not assume or have any responsibility, however, with respect to any other obligation or liability of Sellers not expressly included within the definition of Assumed Liabilities***.

Doc 1-2 at § 2(b) (emphasis added). The Kelsyus Purchase Agreement defines the term "Assumed Liabilities" as meaning "all obligations of Sellers [180s] under those agreements, contracts, and other similar arrangements set forth on <u>Exhibit A</u> to the Assignment and

Assumption Agreement, but only to the extent such obligations accrue from and after the Closing Date for reasons other than a default by Sellers." *Id*. at § 1. Exhibit A to the Assignment and Assumption Agreement is entitled "Assumed Agreements" and contains a table listed under the heading "Assumed Contracts" that lists seven contracts dated between 2001 and 2003. Significantly, the 1999 Withdrawal Agreement between Plaintiffs and Gray Matter is ***not*** one of the assumed contracts listed in Exhibit A to the Assignment and Assumptions Agreement.

Through these provisions, Swimways clearly and deliberately did not assume any contractual obligation or liability of 180s for any contract that was not listed in Exhibit A to the Assignment and Assumptions Agreement, such as the Withdrawal Agreement. Accordingly, Plaintiffs and their counsel have no reasonable basis to allege that Swimways, or any of the other named defendants, have any payment obligations to Plaintiffs under the Withdrawal Agreement, and Plaintiffs' claims, each of which rests, directly or indirectly, on such purported obligations, are utterly baseless.

> **2.    Plaintiffs' claims are also barred by the findings in the previous arbitrations in which they participated**

The fact that Swimways and the other named defendants have no duty or obligation to compensate Plaintiffs for the sale or use of so-called Key Products or related intellectual property is further confirmed by the findings of the arbitrators in the Third and Fourth Arbitrations. A reasonable inquiry into these arbitration rulings and applicable law would have revealed to Plaintiffs and their counsel that these rulings bar their present claims under the principles of collateral estoppel.

Collateral estoppel, or issue preclusion, forecloses "relitigation in a subsequent action of an issue of law or fact that has actually been and decided in the initial action." *Havoco of Am., Ltd. v. Freeman, Atkins, Coleman, Ltd.*, 58 F.3d 303, 307 (7th Cir. 1995); *see also Taylor v. Sturgell*, 553 U.S. 880, 892 (2008). Collateral estoppel applies when: "(1) the issue sought to be precluded is the same as that involved in the prior action; (2) the issue was actually litigated; (3) the determination of the issue was essential to the final judgment; and (4) the party against whom

estoppel is invoked was fully represented in the prior action."[6] *Havoco*, 58 F.3d at 307 (citations omitted). Further, "courts frequently afford unconfirmed arbitrations preclusive effect on subsequent federal proceedings," particularly where, as here, the arbitration award decided privately negotiated commercial rights, and the court is not confronted with the responsibility of protecting federal rights. *Stulberg v. Intermedics Orthopedics, Inc.*, 997 F. Supp. 1060, 1067-68 (N.D. Ill. 1998) (collecting cases where courts have given preclusive effect to unconfirmed arbitration awards where contractual or state law rights are at issue); *accord Plastic Recovery Techs., Co. v. Samson*, No. 11-c-2641, 2011 WL 3205349, at *3 (N.D. Ill. July 28, 2011) (finding that a prior AAA arbitration award was a final judgment on the merits that barred some of the plaintiffs' claims under the related doctrine of *res judicata*); *Hybert v. Shearson Lehman/American Express Inc.*, 688 F. Supp. 320, 325 (N.D. Ill. 1988) (noting that "the arbitration decision prevents the relitigation of any issue actually litigated and determined if its determination was essential to the matter" under the doctrine of issue preclusion); *Abdul-Ahad v. Nationwide Mutual Fire Ins. Co*., No. CPU4-15-002616, 2016 WL 4269512, at *3-4 (Del. Ct. Common Pleas Aug. 10, 2016) (finding that an issue decided in a prior binding arbitration was considered an adjudication on the merits and given the same preclusive force as a final judgment); Restatement (Second) of Judgments § 84 (1982) ("Except as stated in Subsections (2), (3), and (4), a valid and final award by arbitration has the same effects under the rules of res judicata, subject to the same exceptions and qualifications, as a judgment of a court.").

---

[6] Due to the similarity between the applicable standards, one reaches the same result in this case—*i.e.*, an unavoidable conclusion that Plaintiffs' claims are barred by collateral estoppel—regardless of whether one applies the federal collateral estoppel principles articulated above or the issue preclusion law of Illinois (the state where this Court sits in diversity jurisdiction) or the issue preclusion law of Delaware (the law governing substantive matters pursuant to the dispute resolution provisions of the Withdrawal Agreement, *see* Doc. 19-1 at §4.1(b)). *See Havoco*, 58 F.3d at 308 n.9 (setting forth Illinois state law issue preclusion standard); *Abdul-Ahad v. Nationwide Mutual Fire Ins. Co.*, No. CPU4-15-002616, 2016 WL 4269512, at *4 (Del. Ct. Common Pleas Aug. 10, 2016) (setting forth Delaware state law issue preclusion standard).

Here, Plaintiffs raised and fully litigated in the Third Arbitration the same issue that underlies each of their claims in their current Amended Complaint—*i.e.*, whether the Kelsyus asset sale constituted an assignment of 180s' contractual rights and obligations under the Withdrawal Agreement to Swimways. *See* Ex. C. at 8. An assignment of the Withdrawal Agreement, Matlin and Waring argued, would have been in contravention of Section 5.9 of the agreement, which required their prior written consent to such an assignment. *Id*. In addressing this claim raised by Matlin and Waring, the arbitrator explicitly ruled that, as a matter of law, "the Asset Sale to Swimways did not constitute an assignment of [180s'] rights and obligations" under the Withdrawal Agreement. *Id*. The arbitrator continued, finding "[t]he Withdrawal Agreement was not one of the assets transferred pursuant to the Asset Sale" and 180s—***not*** Swimways—"remains responsible for any compensation owed to [Matlin and Waring] under the Withdrawal Agreement." *Id*. As 180s did not assign its rights and obligations under the Withdrawal Agreement to Swimways, Swimways did not assume 180s' rights and obligations under the Withdrawal Agreement, and Swimways (and the other named defendants) have no payment obligations to Plaintiffs.

This clear, unambiguous ruling meets each of the necessary elements for the application of collateral estoppel.[7] First, the ruling addresses the same issue raised by Plaintiffs' claims—*i.e.*, whether any payment obligations under the Withdrawal Agreement were assigned to Swimways pursuant to the Kelsyus asset sale. Second, this issue was actually litigated. *See id*. (ruling on Matlin and Waring's theory that the asset sale constituted an assignment of 180s' rights and obligations under the Withdrawal Agreement as part of its ruling on Count II of the Third

---

[7] Although Plaintiffs are barred from asserting that Swimways is a successor to 180s with respect to the Withdrawal Agreement under a related but separate ruling in the Third Arbitration, *see* Ex. C at 8-9, to the extent that Plaintiffs nonetheless attempt to advance such an argument in their allegations in their Amended Complaint, their claims would also be barred under principles of *res judicata*, as Swimways would be in privity with 180s (the other party to the arbitration) under such a theory.

Arbitration). Third, this ruling was essential to the final judgment by the arbitrator that 180s did not breach the Withdrawal Agreement by virtue of the asset sale to Swimways. *See id*. at 8-9. And finally, the parties against whom estoppel is invoked, Plaintiffs, were parties to the Third Arbitration, were represented by counsel, conducted discovery, and participated in a summary judgment proceeding in which the arbitrator reviewed and considered the pleadings and submitted documents, including a motion, opposition, and reply with "voluminous exhibits attached thereto" prior to issuing his thorough written opinion and rulings. *See id*. at 1-3, 8-10; *see also* Doc 19-1 at § 4 (dispute resolution provisions providing for, *inter alia*, binding arbitration and certain arbitration procedures). Accordingly, Plaintiffs are barred under the principles of collateral estoppel from relitigating this issue that was directly and finally decided in binding arbitration and are precluded from alleging in support of their claims that Defendants have any obligation to compensate Plaintiffs under the Withdrawal Agreement.

Further, in addition to being precluded by the arbitrator's ruling in the Third Arbitration, Plaintiffs' asserted theory that the transfer of assets, including the so-called Key Product assets and associated intellectual property, in the Kelsyus asset sale somehow resulted in the transfer of the "rights and obligations" of the Withdrawal Agreement to Swimways is also barred by the arbitrator's ruling in the Fourth Arbitration. There, the arbitrator found that "[t]he Withdrawal Agreement distinguishes between the transfer of assets (e.g., the Key Product assets and related intellectual property) with the 'rights and obligations' of the Withdrawal Agreement." Ex. E at 2. Plaintiffs' theory—essentially arguing that 180s could not have transferred one (the assets) without the other (the obligations)—which it advances again here, was clearly considered and rejected by the arbitrator in dismissing Counts I and II in the Fourth Arbitration, and this ruling thus further precludes Plaintiffs' present claims against Defendants.

In addition, to the extent that Plaintiffs seek to leverage an unspecified indemnification arrangement between 180s and Swimways, *see* Doc. 19 at ¶34 (alleging vaguely that Swimways somehow "thereby indemnified Gray Matter in the event of a dispute arising from a failure to pay Matlin and Waring under these [unspecified] provisions of the Withdrawal Agreement."),

such an argument is also precluded by the arbitrators' rulings in the Third and Fourth Arbitrations. First, as discussed above, the arbitrator in the Third Arbitration expressly held that 180s remains responsible for any compensation owed to Matlin and Waring under the Withdrawal Agreement. Ex. C at 8. Plaintiffs are not permitted to seek compensation purportedly owed to them by 180s directly from Defendants, regardless of the presence of any alleged indemnification arrangement.[8] Moreover, the arbitrator's ruling in the Fourth Arbitration that Matlin and Waring were "*fully compensated* for the transfer of the Key Products and related intellectual property to Swimways" precludes Plaintiffs from baselessly manufacturing a dispute between Plaintiffs and 180s over compensation allegedly owed to Plaintiffs, so as to create a link to Swimways through an unspecified indemnification arrangement. *See* Ex. E at 2.

In short, these prior arbitration rulings establish and confirm that Plaintiffs have been fully compensated by 180s under the Withdrawal Agreement, any future compensation obligations under the Withdrawal Agreement remain the responsibility of 180s, and neither Swimways nor any of other named Defendant has any compensation obligations to Plaintiffs under the Withdrawal Agreement.

### C. Plaintiffs' Claim of Fraud Is Not Warranted by Existing Law and Is Inadequately Pled

In addition to the fundamental defects described above, Plaintiffs' claim of fraud suffers from a number of other deficiencies. These deficiencies further demonstrate the baselessness of Plaintiffs' fraud claim, both in law and in fact, and show that the assertion of this claim cannot have been the product of a reasonable inquiry.

In their Amended Complaint, Plaintiffs shift the focus of their fraud claim to an alleged forgery of patent assignment documents, alleging in particular that "[o]n November 8, 2002,

---

[8] The Assignment and Assumption Agreement of the Kelsyus Purchase Agreement provides, for example, that "[t]his Assignment and Assumption Agreement constitutes a commitment on the part of Buyer to undertake certain obligations to Sellers, and no third party

(continued...)

Gray Matter filed an assignment of Key Product IP at the USPTO, and these assignments [*sic*] contained signatures and altered signature dates purportedly written or authorized by Waring that were forged or otherwise fraudulently constructed without Waring's authorization. (November 2002 Assignment attached hereto as Exhibit 'B' and incorporated herein)."[9] Doc. 19 at ¶40. This is the sole forgery and fraud regarding the assignment of Key Product IP that Plaintiffs allege with any particularity.[10] Even if Plaintiffs' forgery allegations are accepted as true, their fraud claim is still frivolous, as it is precluded by the Withdrawal Agreement, barred by clear rulings in the Fourth Arbitration, and inadequately pled and logically incoherent.

### 1. The Withdrawal Agreement precludes Plaintiffs' fraud claim

The baselessness of Plaintiffs' fraud claim is established by the Withdrawal Agreement itself. Section 2.1 of the Withdrawal Agreement provides: "Key Products: All products and product ideas identified on Exhibit C attached hereto (collectively, the "Key Products") and all intellectual property rights of the Company related thereto ***are, and shall remain***, the exclusive property of the Company." Doc. 19-1 at § 2.1 (bold italic emphasis added). In their Amended Complaint, Plaintiffs even acknowledge that at least some intellectual property rights related to

---

(...continued from previous page)

shall have any rights hereunder." *See* Doc. 1-2 at Exhibit A; *see also id.* at § 8(b) (no third party beneficiaries).

[9] The November 2002 Assignment appears to begin on page twenty-two of Exhibit B of the Amended Complaint (Doc. 19-2) and consists of a two-page assignment recordation cover sheet and a two-page assignment document.

[10] In paragraph 74 of the Amended Complaint, Plaintiffs allege that "[o]n December 9, 2003, Gray Matter, filed a second assignment of Key Product IP relying on forged signatures of the inventors Matlin and Waring." Doc. 19 at ¶74. Exhibit B of the Amended Complaint (Doc. 19-2) at pages two through nine contains an assignment from 180s to Kelsyus LLC of a number of listed patents and patent applications that was executed on December 9, 2003 and recorded on December 22, 2003. This document does not contain the signatures of either Matlin or Waring. Outside of the November 2002 Assignment that is the subject of paragraph 40 of the Amended Complaint, Plaintiffs identify no other assignment documents associated with any of patents or patent applications listed in the December 2003 assignment to Kelsyus that contain allegedly forged signatures or were otherwise purportedly improper.

the Key Products were properly assigned to Gray Matter. Doc. 19 at ¶25.

Further, the Withdrawal Agreement, in an abundance of caution, also contains an additional, independent assignment provision. This provision provides:

> 3.4 <u>Assignment of Intellectual Property</u>. All inventions, discoveries, innovations, designs, ideas, developments, improvements, procedures, techniques, knowledge and know-how (collectively "<u>Developments</u>") developed, discovered, or conceived by as Seller [i.e., a Plaintiff], individually or jointly with others, whether or not patentable or copyrightable, relating to any Key Product or to a Seller's services for the Company hereunder shall be the exclusive property of the Company, and each Seller hereby assigns, transfers, and conveys to the Company all of his right, title and interest in and to any and all such Developments. Each Seller shall disclose fully, as soon as practicable, all Developments to the Board, and shall set forth such Developments in writing if the Board so requests. At any time and from time to time, upon request by the Company, each Seller shall execute and deliver to the Company any and all instruments and documents provide evidence and do any and all other acts that the Board may deem necessary or desirable to document such transfer or to enable the Company or any of its subsidiaries to file and prosecute applications for and to acquire, maintain and enforce any and all patents, registered marks or copyrights under United States or foreign law with respect to any such Developments or to obtain any extension, validation, reissue, continuance, or renewal of any such patent, mark, or copyright.

Doc. 19-1 at § 3.4. Thus, when Plaintiffs executed the Withdrawal Agreement, they (again) assigned to Gray Matter any and all rights they may have had in any intellectual property related to the Key Products, including any such intellectual property rights Plaintiffs now allege are connected to separate, purportedly forged assignment documents.

So even if one were to accept as true Plaintiffs' spurious allegations regarding Gray Matter's alleged forgery of the November 2002 Assignment and other unspecified assignment documents, Plaintiffs' fraud claim is still baseless because they cannot show any harm arising from this alleged fraud. Plaintiffs' fraud claim is premised on the (incorrect) conclusion that Gray Matter—and then Swimways—never had full ownership of the Key Product IP and this putative fraud was supposedly perpetrated to somehow "limit the royalties owed to Plaintiffs." *See* Doc. 19 at ¶¶ 73 & 75. But, pursuant at least to the assignment provision contained in Section 3.4 of the Withdrawal Agreement, Plaintiffs assigned any and all rights they possessed in the Key Product IP to Gray Matter, which subsequently assigned these rights to Swimways as

part of the Kelsyus asset sale. Accordingly, even if the particular assignment documents identified or vaguely alluded to by Plaintiffs are assumed to be forged or otherwise inauthentic, the recordation of these documents caused Plaintiffs no actual harm or prejudice to their rights. In other words, Plaintiffs unequivocally assigned any and all rights in Key Product IP to Gray Matter under the Withdrawal Agreement, meaning that Gray Matter—and then Swimways—had full ownership of the Key Product IP. And, these other assignment documents, regardless of what one assumes regarding their authenticity, are substantively duplicative of and redundant with the assignment in the Withdrawal Agreement and accurately reflect the ownership of these rights as between the parties.

### 2. Plaintiffs' fraud claim is also barred by the binding rulings in the Fourth Arbitration

Moreover, Plaintiffs previously raised these same allegations underlying their fraud claim in the Fourth Arbitration, asserting that the IP rights assigned in the Withdrawal Agreement did not transfer and that the purported forged or altered assignments that appear in the chain of title for the Key Product patents puts the ownership of these patents into question. The arbitrator in the Fourth Arbitration rejected Plaintiffs' arguments, and Plaintiffs are barred by principles of collateral estoppel from raising them again here.

In Count I of the Fourth Arbitration, Plaintiffs alleged that because the Third Arbitrator ruled that the obligations under the Withdrawal Agreement did not transfer to Swimways, "the IP rights assigned in the Withdrawal Agreement did not transfer. Further 180's [sic: 180s] has recorded assignment documents in the USPTO to evidence a transfer of the IP rights contrary to the Arbitrator's ruling." Ex. E at 2. In rejecting this argument, the Arbitrator ruled that the Withdrawal Agreement distinguishes between transfers of assets (including Key Product IP rights) with the "rights and obligations" of the Withdrawal Agreement, and found that the Withdrawal Agreement and the prior arbitration rulings support the conclusions that "(1) 180s owned all rights in the Key Product IP, (2) 180s had the right to transfer its assets (e.g., the Key Product assets and related intellectual property) to Swimways, (3) 180s transferred the Key

Product assets and related intellectual property to Swimways, and (4) the Claimants [Matlin and Waring] were fully compensated for the transfer of the Key Products and related intellectual property to Swimways." *Id*. The Arbitrator also found that Plaintiffs were bound by the ruling in the Third Arbitration that Gray Matter/180s was the rightful owner of the intellectual property rights in the Key Products and that Plaintiffs could not now "contest that, as the owner of the full right, title, and interest in the patents, 180s was not entitled to sell, license, practice, or even abandon the intellectual property." *Id*. at 2-3. Finally, in dismissing Count I, the Arbitrator found that, even if the Arbitrator assigned any credibility to the forgery allegations, under Section 3.4 of the Withdrawal Agreement, they were required to execute and deliver all instruments necessary to transfer the Key Product IP, and thus failed to state any claim for relief associated with such alleged forgeries. *Id*. at 4-5. The Arbitrator also ruled against Plaintiffs in their related Count V. *Id*. at 6.

The fourth arbitrator's clear rulings meets each of the necessary elements for the application of collateral estoppel. The rulings address the same issue raised by Plaintiffs' fraud claim, the issue was actually litigated, the rulings were essential to the final judgment, and Plaintiffs were represented by counsel and had a full and fair opportunity to fully litigate their claims. *See id*. at 1-4, 6 (ruling on Counts I and V that 180s (and then Swimways) had full ownership of the rights to the Key Product intellectual property). Accordingly, Plaintiffs are barred under the principles of collateral estoppel from asserting a claim of fraud based on an allegation that Plaintiffs never assigned their rights to 180s to certain Key Product IP.

### 3. Plaintiffs' fraud claim is logically incoherent and inadequately pled

Finally, in addition to the fundamental defects identified above, Plaintiffs have also failed to plead their claim of fraud with the required particularity under Federal Rule of Civil Procedure 9(b), as the Court held in its dismissal order (Doc. 40 at 12). To state a claim of fraud in Illinois (where this Court sits in diversity jurisdiction), one must allege facts sufficient to show: "(1) a false statement of material fact; (2) known or believed to be false by the party making it; (3) made to induce the other party to act; (4) action by the other party in justifiable reliance on the

truth of the statement; and (5) damage to the other party resulting from such reliance. *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 681 (Ill. 1989) (citation and editing marks omitted). Here, Plaintiffs have failed to allege any facts showing (i) that Defendants, individually or collectively, made any false statement to Plaintiffs, as opposed to allegedly false statements to the USPTO; (ii) that Defendants, individually or collectively, made any false statements to induce Plaintiffs to act; (iii) any action taken by Plaintiffs in justifiable reliance on the truth of the statement; or (iv) any damage to Plaintiffs resulting from this reliance. Indeed, Plaintiffs' fraud claim lacks any logical coherence. In particular, the only false statement that Plaintiffs allege in support of their fraud claim is the purported filing of forged assignment documents to the USPTO. But, Plaintiffs themselves are the ones who believe that these documents are forged, and Swimways' purported knowledge or belief as to the falsity of these assignment documents is alleged to have come *from Plaintiffs themselves*. *See* Doc. 19 at ¶48. So Plaintiffs have not alleged and cannot plausibly allege that they took any actions based on these alleged incorrect filings in *justifiable reliance on the truth* of the filings. *See* Doc. 40 at 12 (holding that alleged forgeries "were not directed at the Plaintiffs with the intent to induce the Plaintiffs to do anything at all."). Nor can they plausibly allege that they suffered any damage resulting from such (missing) reliance.

## IV.   CONCLUSION

Defendants Spin Master Corp., Spin Master Ltd., and Swimways Corporation respectfully request that the Court issue appropriate Rule 11 sanctions, including the payment of Defendants' attorneys' fees incurred in dealing with this frivolous suit, against Plaintiffs Tai Matlin and James Waring and their attorneys, Stoltmann Law Offices, P.C., for filing an Amended Complaint that contains frivolous allegations that lack any factual foundation, are precluded by prior binding arbitration rulings, and were made without a reasonable and competent inquiry. Defendants further request Plaintiffs' frivolous Amended Complaint be dismissed with prejudice, rather than dismissed without prejudice pursuant to this Court's Order of July 20, 2018 (Docs. 40-41).

Dated: August 15, 2018              Respectfully submitted,


By: /s/Nicole L. Little
    Allen E. Hoover (IL 6216256)
    Nicole L. Little (6297047)
    FITCH, EVEN, TABIN & FLANNERY LLP
    120 South LaSalle St., Suite 2100
    Chicago, Illinois 60603
    Telephone: (312) 577-7000
    Facsimile: (312) 577-7007


    OF COUNSEL:
    Jonathan G. Graves (pro hac vice)
    COOLEY LLP
    One Freedom Square
    Reston Town Center
    11951 Freedom Drive
    Reston, VA 20190
    Telephone: (703) 456-8000
    Facsimile: (703) 456-8100

    *Attorneys for Defendants Spin Master Corp.,*
    *Spin Master Ltd., and Swimways Corporation*

## **CERTIFICATE OF SERVICE**

The undersigned certifies that all counsel of record who have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Civil Rule 5.5 on August 15, 2018. Any other counsel of record will be served by first class mail.

/s/ Nicole L. Little
Nicole L. Little

*Attorney for Defendants Spin Master Corp.,*
*Spin Master Ltd., and Swimways Corporation*